# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANETTE SUE HUMECKY,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>MICHAEL. J. ASTRUE,<br>Commissioner of Social Security,<br><br>　　　　　Defendant.<br>_____ | Case No. 07-cv-01010-TAG<br><br>MEMORANDUM OPINION AND ORDER<br>ON PLAINTIFF'S APPEAL FROM<br>ADMINISTRATIVE DECISION<br><br>ORDER REMANDING CASE PURSUANT TO<br>SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING CLERK TO ENTER<br>JUDGMENT IN FAVOR OF PLAINTIFF AND<br>AGAINST DEFENDANT |

Plaintiff Jeanette Sue Humecky ("Plaintiff") seeks judicial review of an administrative decision denying her claims for disability insurance benefits ("disability benefits") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq.* Plaintiff filed her complaint on July 16, 2007. (Doc. 1.) The matter has been fully briefed by the parties. (Docs. 15, 16, 18.)

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed before a United States Magistrate Judge, and by order dated September 17, 2007 and docketed September 18, 2007, this action was assigned to the United states Magistrate Judge for all further proceedings and entry of judgment. (Doc. .)

## PROCEDURAL HISTORY

According to the administrative record ("AR"), Plaintiff's application for disability benefits was filed on June 14, 2004. (AR 72-75). In her application, Plaintiff alleged a disability onset date of April 4, 2003, and described her disabling conditions as "[c]onstant intense pain originating from

1

neck down both arms/hands, aching feeling, numbness & hands feel like they are on fire, drop things, no strength." (AR 72). Plaintiff's application was initially denied on October 28, 2004 *(*AR 33-37), which prompted her request for reconsideration dated November 3, 2004 (AR38). Plaintiff's request for reconsideration was denied on April 27, 2005. (AR 40-45.) On June 3, 2005, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ") (AR 46), and the hearing was conducted on September 14, 2005 (AR 280-301). Plaintiff appeared at the hearing and provided testimony; she was not assisted by an attorney or representative.[1] (*Id.*) On November 15, 2006, the ALJ issued his written findings and orders in this matter, concluding that Plaintiff was not disabled, for purposes of disability benefits, at any time from the date of alleged onset through the date of the ALJ's decision. (AR 21-26). On May 23, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (AR 13-16), finding "no reason under our rules to review the Administrative Law Judge's decision." (AR 13). Thus, the ALJ's decision constituted the Commissioner's final decision in the matter. Plaintiff then brought this action for judicial review pursuant to 42 U.S.C. § 405(g).

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision (made through the ALJ) when the determination is not based on legal error and is supported by substantial evidence. See *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human* Services, 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S.C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988.) Substantial evidence "means such evidence as a

---

[1] Plaintiff has appeared *pro se* throughout the proceeding, including at this level of judicial review. (AR 5-301; *see* Docket sheet generally.)

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the court, to resolve conflicts in the evidence. *Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, the court must uphold the Commissioner's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

Disability insurance benefits under Title II of the Act are available to individuals who have worked in recent years and who are determined to be disabled due to a physical and/or mental impairment. 42 U.S.C. §§ 401 *et seq.* In order to qualify, the person seeking disability benefits must demonstrate that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To be eligible for benefits for disability insurance benefits, a worker must, among other things, be insured for disability purposes and be disabled on that date. 42 U.S.C. § 416(i). 20 C.F.R.

3

§ 404.101(a) provides, in pertinent part, that an applicant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits and that if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

The Commissioner uses a five step sequential evaluation process for determining whether a person is disabled under Title II of the Act. 20 C.F.R. § 404.1520. Step one determines whether the claimant is engaged in substantial gainful activities. If he is, benefits are denied. (*Id.*) If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments that meet the duration requirements, i.e., the impairment(s) are expected to result in death, or have continuously lasted or are expected to last at least twelve months. (*Id.*) If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. (*Id.*) If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. (*Id.* and *see* 20 C.F.R. Part 404, Subpart P, Appendix 1.) If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is conclusively presumed to be disabled. 20 C.F.R. § 404.1520. If the impairment does not, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. (*Id.*) If the claimant is able to perform his previous work, he is not disabled. (*Id.*) If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. (*Id.; see Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).)

The initial burden of proof rests upon a claimant to establish that he "is entitled to the benefits claimed under the Act." *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted). In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step." *Tackett v. Apfel*, 180 F.3d 1094, 1098

4

& n.3 (9th Cir. 1999)(italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

Here, the ALJ determined that Plaintiff's earning records showed that Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2008; that Plaintiff had not engaged in substantial gainful activity from April 4, 2003, the date on which Plaintiff claimed her disability began, through the date of the ALJ's decision; and that Plaintiff had fibromyalgia, a severe impairment that caused significant limitations in her abilities to perform basic work activities, but that this impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 21-23). The ALJ also found that Plaintiff had the residual functional capacity to perform the exertional demands of light work, or work which required maximum lifting of 20 pounds and frequent lifting of 10 pounds. (AR 24). No other exertional or non-exertional limitations were recognized. (*Id.*) The ALJ concluded that Plaintiff was not disabled because she retained the ability to perform her past relevant work as an account clerk throughout the period in question. (AR 25, 26).

## **ISSUES**

After a careful review of Plaintiff's opening and reply briefs, this Court understands the issues raised by Plaintiff to be:

1. Substantial evidence does not support the ALJ's decision that Plaintiff is not disabled because the ALJ improperly discounted and/or disregarded the opinion of Plaintiff's treating physician, Dr. Rolando Young. Consequently, the decision must be reversed. Plaintiff contends that the Court should credit Dr. Young's opinion as true in determining whether or not to remand this matter for further proceedings. (Plaintiff's Opening Brief ("OB") at pp. 4, 5, 9.)

2. The administrative record is incomplete. Not all documents Plaintiff submitted during the administrative portion of these proceedings are contained in the record and the transcript of the September 14, 2006 hearing is missing portions of Plaintiff's testimony. (OB at p. 4.)

3. The medical opinion evidence of Dr. S. Bhangoo is unreliable. To the extent the ALJ relied upon that opinion in reaching his conclusions about Plaintiff's disability status, the ALJ's decision is not supported by substantial evidence. (OB at p. 4.)

5

4.  The ALJ improperly discounted and/or discredited Plaintiff's subjective testimony regarding her symptoms.  (OB at pp. 4, 9.)

## STATEMENT OF FACTS

Plaintiff was 37 years old on April 4, 2003, the date she claimed her disability began.  (AR 72).  Plaintiff did not provide a diagnosis of her condition at that time; instead, she described her symptoms and the limitations they imposed on her ability to perform work-related activities.  (*Id.*) She said that she was in "[c]onstant [and] intense pain, originating from [her] neck [and radiating] down both arms [into her] hands[;] aching feeling[;] numbness & hands feel like they are on fire, drop things, no strength [*sic*]."  (*Id.*)  Describing how her condition limited her ability to work at that time, Plaintiff stated, "When I write, type, and sit up for long periods of time, no strength anymore, drop things often [*sic*]."  (AR 85).  According to Plaintiff, her symptoms first began to bother her in April 2001.  (*Id.*)  After her symptoms emerged, she continued to work until December 2001, and then went back to work in August of 2002 because she needed the income, but she worked fewer hours due to her condition.  (*Id.*)  Plaintiff finally stopped working in April 2003 because "[t]he pain was getting worse and [it was] too much on her physically.  (*Id.*)

Plaintiff was born on September 28, 1966.  (AR 72).  Her educational achievements include graduating high school (AR 91) and earning an Associate of Arts degree in accounting in 1991.  (AR 91, 285).  Plaintiff has an 18-year work history, beginning when she was approximately 16 years old.  (AR 81, 83).  Before her disability began, Plaintiff worked largely in an accounting/clerical capacity for various enterprises.  (AR 81, 83, 86).  Her employers included businesses in the fields of real estate, health care, energy, advertising, and law.  (AR 86).

In an Adult Function Report dated January 15, 2005 (AR 109-116), Plaintiff reported that it takes her "awhile to get up in the morning" (AR 109); her grammar-school aged daughter is able to prepare for school each morning on her own (AR 109); Plaintiff attends to the food and water needs of the family's dogs each day with the assistance of her daughter (AR 110); and Plaintiff  picks up around the house each day and "sometimes" gets dinner ready, perhaps a couple of times per week (AR 111).  Plaintiff also reported that her ability to cook has been impacted by her symptoms because she drops dishes, pans, and glasses, cuts herself with knives and cannot open the lids on jars

; she is able to dust the house and, with some assistance by her daughter, do the laundry but the time it takes Plaintiff to do these household tasks has been affected by her symptoms. (AR 111). Plaintiff also reported that she is unable to sit for long without experiencing aches (AR 109); she reports aches and having no strength (A. R. 110); writing causes her pain (AR 116) and she needs help with buttoning her clothing, putting on shirts that go on over her head, and bathing her back and shoulder areas (AR 110). Plaintiff further reported that she cannot dry her hair after washing because her hands go numb in the process; she needs help cutting her food; the symptoms disturb her sleep, and she sometimes awakes with fingernail cuts and fingernail indentations in her hands. (AR 110). Plaintiff also reported that she goes outside about twice each day, once to feed the family dogs (AR112); she is able to walk for about one block before she needs to return home to rest (AR 114); and she is able to ride in a car, and to drive a car but only for a very short distance because her hands go numb (AR 112). Plaintiff also does shopping, both in stores and by telephone, and shops for groceries with her daughter's help about once a week and her husband manages the household finances. (AR 112).

Plaintiff reported that she has no hobbies but watches television for about two hours each day. (AR 113). Plaintiff describes her days as "unproductive." (AR 109). Plaintiff's social activities consist entirely of talking to family members on the telephone for short periods of time each day and she no longer goes out socially on a regular basis. (AR 113). Plaintiff attributes her inability to participate in social activities she formerly did (beach, dinner out, other events) to her aches, fatigue, and her lack of strength, ambition, and desire. (AR 114). Plaintiff's symptoms affect her ability to lift, squat, bend, stand, reach, walk, sit, and use her hands. Plaintiff estimates that she could lift maybe a couple of pounds and explains that when she sits, her neck and shoulders ache, and she is unable to reach because of her condition. (AR 114).

**A.    _Medical Evidence_**

    1.    Diagnostic and Treatment Information

    (a)    Occupational Therapist Glynn

The earliest treatment information related to Plaintiff's fibromyalgia is dated May 14, 2002. (AR 148-149). Dr. Sunil Ramnani, a physician with Kaiser Permanente, referred Plaintiff to

7

occupational therapist Marie Glynn's occupational hand trauma rehabilitation program. (*Id.*) In addition to being an occupational therapist, Ms. Glynn was a certified hand therapist. (*Id.*) In her report to Dr. Ramnani, Ms. Glynn described Plaintiff as "pleasant" (AR 149) and noted that Plaintiff had a diagnosis of bilateral paresthesias[2] of the upper extremities of unknown origin (AR 148). Plaintiff presented "with 'glovelike' numbness over both upper extremities, with protective sensation throughout. Her numbness and tingling are 'constant,' and are worse when she is inactive and with above shoulder activities. She also has bilateral weakness, shakiness (mild) and is not sleeping well because her hands wake her in the night. ... Pain is moderate at rest, and mild with activity." (AR 148-149). Plaintiff was not taking pain medication at that time. (*Id.*) Plaintiff's gross grip strength was measured by Ms. Glynn in an independent test as was Plaintiff's fingertip pinch. (AR 148). Ms. Glynn reported that Plaintiff's gross grip strength in both her hands was "limited." (*Id.*) Plaintiff's range of motion was found to be within normal limits. (*Id.*)

With regard to functioning, Plaintiff reported doing all personal care and most light activities of daily living. (AR 149). She "struggle[d] with fastening her bra in the back, hair care, prolonged writing, opening tight jar lids, cutting meat, and all tight gripping and lifting activities." (*Id.*) Ms. Glynn recommended an occupational therapy program that included desentization, progressive strengthening, and activities of daily living along with adaptive equipment for independence, as needed. (*Id.*) Plaintiff was not working at that time. (AR 148).

On June 12, 2003, Plaintiff went to see Dr. Ramnani, an internal medicine practitioner at Kaiser. (AR 145). Her chief complaint was bilateral upper extremity paresthesia and pain, with weakness in the hand. (*Id.*) Peripheral radiculopathy was likely, per Dr. Ramnani and Dr. Inocentes. Pain relief medication of Tylenol was listed in the charting notes. (*Id.*) A nerve conduction study was ordered. (*Id.*)

An electromyography study was done on June 20, 2003, and it showed no signs of nerve compression. (AR 144). It also showed no electrical findings for carpal tunnel syndrome, ulnar neuropathy or cervical neuropathy. (AR 142).

---

[2] "Paresthesia" is defined as "sensation (e.g., tingling or pins and needles); usually associated with partial damage to a peripheral nerve." Rothenberg and Chapman, *Dictionary of Medical Terms,* 437 (5th ed., 2006).

(b)    Dr. Inocentes

Plaintiff next saw Dr. Alan Inocentes, a physical medicine and rehabilitation practitioner at Kaiser, on July 29, 2003. (AR 142, 143). He had last seen Plaintiff about one year before. (AR 142). His notes from the July 2003 appointment show that Plaintiff was alert, in no acute distress, pleasant and cooperative. (*Id.*) She continued to report bilateral arm numbness (from shoulder down through the fingertips) and tingling. (*Id.*) Plaintiff also reported that the numbness had not changed since she last saw him. (*Id.*) She rated her pain at seven out of ten. (*Id.*) She was directed to take Tylenol as needed for pain. (*Id.*) Dr. Inocentes examined Plaintiff, noting no atrophy of upper extremities, no deformities, active range of motion within normal limits, deep tendon reflexes intact, active range of motion of the neck within normal limits, no pain. (*Id.*) A manual muscle test was conducted with some break out during the process. (*Id.)* On sensory testing, there was a diffuse decrease in sensation to light touch and pinprick following the shoulders all the way down to the fingertips but following no radicular or peripheral pattern. (*Id.*)

Plaintiff's condition was not diagnosed by Dr. Inocentes. Rather, it was described as bilateral upper extremity numbness or apparent sensory deficit, not following any radicular or neuropathic pattern of unknown origin. (*Id.*) Treatment changes included starting Plaintiff on Nortriptyline to address the discomfort. (*Id.*) A cervical MRI of the spine was ordered to rule out any cervical spinal condition. (*Id.*) The MRI was done on August 8, 2003; it showed small disc bulges but no compression of nerves or spinal cord. (AR 140, 141).

Plaintiff returned to see Dr. Inocentes on August 26, 2003 for her upper arm numbness and tingling. (AR 139.) Plaintiff had not been compliant with the new medication regimen of Nortriptyline since her last appointment with Dr. Inocentes because of side effects, nausea and dizziness. (*Id.*) Dr. Inocentes repeated the same tests he conducted at the previous appointment and found essentially the same results. (*Id.*) He offered Plaintiff tentative restrictions to assist in mitigating her condition, but Plaintiff was not receptive. (*Id.*) The doctor's notes report Plaintiff as initially cooperative, with some belligerence, but becoming more so over the course of the appointment, expressing an inability to understand why she could not be put on disability. (*Id.*) He recommended a trial of Neurontin, something that Plaintiff did not willingly accept but after some

further discussion, Plaintiff agreed to cooperate with the new medication plan. (*Id*.) Additionally, it was agreed that she should see Dr. Young again to determine if there is anything further that might be done. (*Id*.)

        (c)    <u>Dr. Young</u>

Plaintiff saw Dr. Rolando Young, a neurologist, sometime after this last appointment with Dr. Inocentes. On September 29, 2003, Dr. Young prepared a report to Dr. Inocentes about Plaintiff's health condition. (AR 164). In that report, Dr. Young recounts Plaintiff's history as it related to a constellation of persistent, painful, and functionally limiting symptoms. (AR 164-166). The symptoms emerged shortly after a thyroid surgery done in 2001 or 2002. (*Id*.) According to Dr. Young, Plaintiff's pain originated at the base of her neck, came down her shoulders, then down to her hands and fingers. (*Id*.) Plaintiff reported having no strength in her hands, which she also described as being weak and painful. (AR 164). Plaintiff reported that she was unable to function with her hands, even using a computer; she could last only for 30 minutes. (*Id*.) She also experienced tingling pain from the neck down. (*Id*.) Plaintiff reported that she tired easily and experienced constant shooting pain, apparently more problematic at bedtime. (*Id*.) Plaintiff used a special pillow, which helped. (*Id*.) Plaintiff reported that she had some restriction with her work when she tried to resume working. (*Id*.) She also reported taking medication for the symptoms but discontinued its use when it provided little relief. (*Id*.)

Dr. Young's physical exam revealed a well-nourished, well-developed very pleasant woman in no acute distress. (AR 165). He noted that percussion at the posterior cervical region [of the spine] elicited some pain. (*Id*.) Dr. Young conducted an independent examination of Plaintiff and noted, among other things, normal strength in her upper and lower arms but limited grip strength. (*Id*.) Dr. Young also noted subjective paresthesia in both hands but Plaintiff could feel sensation. (*Id*.) The results of the neurological examination were otherwise normal. Dr. Young observed that "[t]he patient has clinical evidence of what suggests cervical radiculitis[3]. However, this has been going on for 1 ½ years . Therefore, I do not have a secure diagnosis." (*Id*.) He recommended an

---

[3] Radiculitis is defined as "[i]nflammation of the root ... of a nerve." Rothenberg and Chapman, *Dictionary of Medical Terms,* 437 (5th ed., 2006).

MRI of the brain and suggested that if there is still no definitive answer after looking at the MRI results, consideration should be given to referring Plaintiff to a tertiary center for additional consultation. (*Id.*)

In October 2003, an MRI of Plaintiff's brain was done by the Kern Radiology Group at the request of Dr. Young. (AR 179.) That test was essentially normal. (*Id.*) At the time the test was conducted, Plaintiff was reporting problems with her neck, shoulders and bilateral hand numbness along with headaches. (*Id.*)

Dr. Young saw Plaintiff again on November 4, 2003. (AR 163.) On this date, Dr. Young again noted no secure diagnosis, but gave a tentative diagnosis of fibromyalgia, and "rule[d] out" demylinating disease. (*Id.*) Dr. Young's notes indicate that Plaintiff had been taking Celebrex but had run out, and the drug was not covered by her insurance. (*Id.*) Dr. Young provided Plaintiff with samples of that medication, scheduled her for a lumbar puncture, and noted that if there was no diagnosis after the cerebrospinal fluid test, a referral to a tertiary center such as University of California Los Angeles might be indicated. (*Id.*) An entry at the bottom of Dr. Young's notes states "off work on disability 4 more weeks."[4] (*Id.*)

In December of 2003, Dr. Young did a lumbar puncture of Plaintiff's spine to rule out multiple sclerosis or any other demylinating disease. (AR 167.) There was still no secure diagnosis of Plaintiff's condition. (*Id.*) The results of the cerebrospinal fluid examination showed no abnormalities relative to Plaintiff's symptoms. (AR 168-178).

Plaintiff saw Dr. Young again on December 19, 2003. (AR 162.) The doctor's tentative diagnosis remained fibromyalgia. (*Id.*) Plaintiff continued to report symptoms of tingling in fingertips, numbness, and nighttime sleep disruption resulting from her symptoms. (*Id.*) Plaintiff also reported no improvement from the Celebrex. (*Id.*)

Plaintiff returned to see Dr. Young on January 6, 2004. (AR 161). Plaintiff's symptoms

---

[4]   The significance of that notation may (or may not) correlate with the "Notice of Final Payment" of state disability benefits issued in mid-November of 2003 and which required supplemental certification in order for benefits to be continued. (AR 269.)

remained unchanged – tingling neck, hands and fingers; sensation "like on a stove"; some muscle cramping. (*Id.*) Dr. Young's recommendations included starting Plaintiff on Neurontin 100 mg. four times per day and referring her to a tertiary center for further evaluation and treatment. (*Id.*)

Dr. Young saw the Plaintiff again a month later. (AR 160). The diagnosis remained unfixed and Plaintiff's symptoms had also remained unchanged. (*Id.*) After she reported no noticeable change on the Neurontin, Dr. Young increased the dosage to 200 mg. (*Id.*)

(d)  Dr. Hwang

On March 9, 2004, Dr. Jane Hwang, a neurologist at Kaiser in Los Angeles, conducted a consultative examination of Plaintiff. (AR 223-224). Plaintiff told Dr. Hwang that she had begun having a pain in her neck shortly after goiter surgery; there was also a tingling sensation that started around her neck and shoulders and then traveled down to her hands over the next several days. (AR 223). Plaintiff said that "[n]ow there is a deep tingling painful paresthesia involving her neck, shoulder, arms and hands. There is pain there all the time. It seems to get worse when [Plaintiff] is trying to do work on a computer or trying to write..." and when Plaintiff turns her neck to the right. (*Id.*) Plaintiff also stated that she has a tendency to drop objects as a result of her condition. Nothing seemed to help the pain; Neurontin had not reduced the symptoms. Plaintiff did not have any symptoms in her legs at that time. (*Id.*)

In the physical examination of Plaintiff conducted by Dr. Hwang, most of the clinical findings appeared normal except that pinprick sensation was reduced "by about 30% in both upper extremities, the shoulder and also the neck. The reduction in pinprick also corresponded to a similar reduction in cold temperature sense in the same area. Around the shoulders the area appeared to correspond to the C4 dermatone." (AR 224). Dr. Hwang's assessment read:

> This is a 37-year-old female who two to three weeks after undergoing surgery for a goiter developed parenthesis and pain in a "cape-like" distribution involving her neck, shoulders, arms, and hands. Her neurological examination is notable for diminished pinprick and cold temperature sense in this "cape-like" distribution with preservation of vibration and light touch. This type of finding can be seen with a syrinx of the cervical cord. ... If a syrinx is not seen, then I would suggest a repeat MRI scan of the cervical cord with attention to the cord itself to rule out a syrinx. (*Id.*)

///

(e)     Dr. Young again

Plaintiff next saw Dr. Young on March 30, 2004.  (AR 159).  According to Dr. Young's notes, Plaintiff's diagnosis remained "insecure."  He noted Plaintiff's consultative visit with Dr. Hwang.  Dr. Young's notes stated that the diagnostic situation now suggested fibromyalgia but further MRI scans of the cervical and thoracic spinal areas were necessary to rule out a syrinx,[5] which Dr. Young considered doubtful.  Dr. Young recommended a repetition of the cervical MRI and an MRI of the thoracic area of the spine and increased the Neurontin to 300 mg. three (3) times per day.  (*Id.*)  Both scans were done on April 26, 2004 and neither indicated the presence of a syrinx.  (AR 229-232).

On May 5, 2004, Plaintiff returned to see Dr. Young.  Again, Dr. Young's notes stated, "no secure diagnosis yet."  (AR 158).  Plaintiff's Neurontin medication was continued and Nortriptyline at bedtime was added.

Plaintiff returned to see Dr. Young in December of 2004.  (AR 155).  Although his notes again described Plaintiff's condition as having no secure diagnosis, they also indicated a working diagnosis of fibromyalgia.  Plaintiff reported symptoms as unchanging.  Neurontin was restarted; Plaintiff was to take Elavil or Nortriptyline at bedtime and was to return four to five  weeks.  (*Id.*)

The medical records reflect that Plaintiff returned to see Dr. Young on March 16, 2005.  (AR 214).  Plaintiff continued to take Neurontin and Nortriptyline as prescribed.  She was also taking Tylenol "all the time" to manage the pain.  Plaintiff continued to experience the same symptoms.  (*Id.*)

Plaintiff's next appointment with Dr. Young was on July 15, 2005.  (AR 213).  Again, Plaintiff's symptoms were causing her pain in her neck, arms, shoulder, back and knees and Plaintiff was taking Tylenol "all the time" to relieve the pain.  (*Id.*)  There was no "secure diagnosis" charted but the working diagnosis was identified as fibromyalgia.  (*Id.*) Plaintiff's next medical appointment

_____

[5]  "A syrinx is a fluid-filled cavity within the spinal cord ... or brain stem ... . ...  Symptoms include flaccid weakness of the hands and arms and deficits in pain and temperature sensation in a capelike distribution over the back and neck; light touch and position and vibration sensation are not affected.  Diagnosis is by MRI. Treatment includes correction of the cause and surgical procedures to drain the syrinx or otherwise open CSF flow."  *The Merck Manual Online Medical Library*, http://www.merck.com/mmpe/sec16/ch224/ch224j.html.

for monitoring and treatment of her condition took place on July 27, 2006. (AR 157). Once again, she saw Dr. Young, and no secure diagnosis was reported in his charting notes. (*Id.*) However, Dr. Young's notes report that Plaintiff was experiencing increased pain in her right shoulder, and her dosage of Nortriptyline was doubled.

Plaintiff saw Dr. Young again on October 4, 2005. (AR 212). Her symptoms included intermittent hip pain. She continued to take Neurontin, Nortriptyline/Elavil, and Tylenol. Dr. Young recommended against taking too much Tylenol, increased the Nortriptyline at bedtime to 75 mg., and recommended an MRI of her left hip. (*Id.*) Again, although there was no "secure" diagnosis recorded, Dr. Young's working assumption was fibromyalgia.

The charting notes in the record indicate that Plaintiff next saw Dr. Young on June 26, 2006, when the diagnosis was described as fibromyalgia. (AR 210). The same symptoms were reported, including hip pain. Plaintiff continued to take the Neurontin, although at a dosage below that prescribed, and the Nortriptyline as prescribed. She also continued to take Tylenol to manage her pain. Dr. Young altered the medication protocol by reducing the Neurontin dosage and frequency, reducing the Nortriptyline dosage, and adding Lyrica. (*Id.*) Charting notes for Plaintiff's next visit with Dr. Young on July 26, 2006, show virtually the same information. (AR 209). The only difference was the report of pain in the right hip as well as the left hip. (*Id.*)

The last charting notes describing medical visits by Plaintiff to Dr. Young are dated August 22, 2006. (AR 208). The diagnosis was fibromyalgia. All medications except Lyrica were discontinued and the dosage of Lyrica was increased. Symptoms were largely unchanged; some sleep disruptions were described, as were aches. (*Id.*)

        2.     <u>Medical/Health Care Provider Opinions Regarding Plaintiff's Residual Functional Capacity</u>

    (a)     <u>Dr. Bugg's Assessment</u>

Dr. George Bugg, a non-examining State Agency consulting physician of unknown specialty, prepared a Physical Residual Functional Capacity Assessment addressing Plaintiff's functional limitations dated October 22, 2004. (AR 194-201). It appears to be based, at least in part, on an agency report that accompanied the consultation request. (AR 150-151). The assessment report

reviewed and summarized Plaintiff's medical record information for the period beginning June 2003 and continuing through May 2004. (AR 150-151). The alleged impairments listed in the report were constant, intense pain in neck, arms and hands. (AR 150). A "Disability Determination and Transmittal Form" associated with the consultation request gives as the primary diagnosis "Disorders of Back, (Discogenic & Degenerative)." (AR 27). Neither the request or the report mention fibromyalgia, and the medical opinion information is reported as "none" at that time. (AR 151). An assessment of Plaintiff's credibility with respect to her subjective symptoms was included in the request. It states, "Partially credible, reported severity of pain, numbness, no strength is not supported by objective findings." (*Id.*) The report's recommendations and conclusions were: "Cl[aimant] is a 38 y/o female w/ non specific pain in hands and shoulders. MERs indicate motor, sen[sory], reflexes [normal] and no secure [diagnosis]. MRI indicates mild spondylosis and disc protrusion and extrusion in TS and CS. E.g., and NERVE STUDIES are [normal.] RFC please." (AR 151).

Based on this limited record review and the conclusions reached about the evidence, Dr. Bugg's Physical Residual Functional Capacity Assessment reported that, with respect to exertional limitations, Plaintiff could occasionally lift and carry 20 pounds and frequently 10 pounds; she could stand or walk with normal breaks for a total of about six hours in an eight-hour workday; she could sit with normal breaks for about six hours in an eight-hour workday; and that she had unlimited push and or pull other than as shown for lift and carry. (AR 195). With respect to postural limitation, Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 196). Dr. Bugg indicated Plaintiff had no manipulative, visual, communicative, environmental limitations. (AR 197, 198). Curiously, Dr. Bugg also said that "[t]he severity of the symptom(s) [i.e., constant intense pain in neck, arms and hands] and its alleged effect on function is consistent, in [his] judgment, with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits." (AR 199). Dr. Bugg also acknowledged that there were no treating or examining source statement(s) regarding the claimant's physical capacities in the file. (AR 200).

///

15

1          (b)      Dr. Young's Assessment

2          Dr. Young prepared a written assessment of Plaintiff's functional capacities dated March 16,

3    2005. (AR 153-154). His diagnosis of Plaintiff's condition was "most likely fibromyalgia." (AR

4    154). Dr. Young reported that Plaintiff had been his patient from 2003 to the date of his statement

5    and that he had last seen Plaintiff on the date the assessment was completed. (*Id.*) Dr. Young

6    concluded that Plaintiff's condition resulted in restrictions on lifting and carrying of three pounds

7    "[o]ne time up to 2 ½ hours during an 8-hour day occasionally" and one pound "over 2 ½ hours

8    during an 8-hour day frequently." (AR 153). He opined that Plaintiff could stand or walk with

9    normal breaks for one hour during an eight-hour workday, and could sit for one to two hours during

10   an eight-hour workday. Plaintiff would need to alternate between sitting and standing and that

11   reliance on breaks/lunch periods would not be adequate for purposes of postural relief. Other

12   positional restrictions Dr. Young identified were in the areas of climbing, balancing, kneeling, and

13   crawling. (AR 154). Dr. Young reported that "any movement elicits all [Plaintiff's] symptoms –

14   aches, pains, joint cracking, fatigue." (*Id.*) Dr. Young opined that Plaintiff's condition also resulted

15   in restrictions in reaching and fingering, with movement making her symptoms appear. He noted

16   environmental limitations of "heat and cold" but concluded that Plaintiff had no problems with

17   seeing, hearing speaking. (*Id.*) Dr. Young added that "[Plaintiff]'s symptoms are of a magnitude

18   that she cannot function." (AR 153). His assessment appears to say that it is based on Plaintiff's

19   subjective testimony but it is also possible, given the format and placement of lines, that Dr. Young

20   was indicating his conclusions were based on both subjective and objective findings.[6]

21        (c)      Dr. Bhangoo's opinion

22        On March 24, 2005, one week after Dr. Young's assessment of Plaintiff's functional

23   capacities, Dr. Sarupinder Bhangoo, a board certified practitioner in internal medicine, performed a

24   comprehensive internal medicine evaluation of Plaintiff, examining her as part of that evaluation

25

26          [6] In the March 2005 assessment form, Dr. Young puts a checkmark in the line between "subjective" and "both."
     The format reads, "Basis for restrictions are OBJECTIVE ___SUBJECTIVE ___BOTH ___Explain." (AR 153).
27   Looking at a second opinion from Dr. Young using the same form (which opinion was received after the ALJ's decision
     was rendered in this matter but before the Appeals Council denied Plaintiff's request for reconsideration), Dr. Young
28   places a checkmark in the same space but circles the word "both." (AR 278).

                                                    16

process. (AR 190-193). Dr. Bhangoo acted at the request of the agency in conducting this examination; he had never treated Plaintiff. He stated that he had reviewed a September 23, 2003 neurological examination and claimed to have reviewed other records in the case file. Beyond the referenced neurological examination, and Plaintiff's "disability allegation," none are specified. (AR 190, 190-193).

Under "Diagnosis," Dr. Bhangoo acknowledged Plaintiff's history of fibromyalgia. (AR 192). He described Plaintiff's chief complaints as generalized pain in the hands, arms, neck, shoulders and knees over a two-year period of time. Dr. Bhangoo's record review also mentioned allegations of pain in the feet and inability to sleep as part of the constellation of Plaintiff's symptoms. His history of present illness stated that Plaintiff reported two years of aches and pains all over her body, especially involving the hands, arms, neck, and shoulder areas. Plaintiff rated the severity of the pain at "9" out of "10" and that the pain was more pronounced in the mornings. (AR 191-192). According to Dr. Bhangoo, Plaintiff reported pain in her knees at night and nighttime sleep disruption as a result of all this pain. Dr. Bhangoo recorded that Plaintiff represented to him that she had been diagnosed with fibromyalgia and took Gabapentin (300 mg. per day) and Nortriptyline (50 mg. per day) for treatment of this condition and its related symptoms. (*Id.*)

Dr. Bhangoo also noted that Plaintiff did not use an assistive device. "Her gait is nonantalgic. She is able to tiptoe and heel walking. [*sic*] Finger-nose and heel-knee tests are normal." (AR 191). Under "General Findings," Dr. Bhangoo noted that "[t]here is multiple trigger point tenderness [sic] all over her spine. They are all limited to the cervical area. There are no trigger points in the gluteal area." (AR 192). Under "General Appearance and Observations," Dr. Bhangoo wrote that Plaintiff "looks her stated age and comes into examination room without difficulty. She moves around well. She is able to climb up and on the examination table. She is able to comfortably get in and out of chair. She does not seem to be in any pain at all." (AR 191).

In reaching his conclusions regarding Plaintiff's functional limits, Dr. Bhangoo also considered the facts that Plaintiff "is able to do her personal care. She is able to cook and clean. She does go to doctors. She does drive. She does go for walks and walks for at least a block a day." (AR 190). Under "Functional Assessment/Medical Source Statement," Dr. Bhangoo stated:

The claimant gives history [*sic*] of generalized aches and pains, which is more constant in her cervical area.[7] As reported in her Review of Records, her MRI was normal, nerve conduction studies are normal and the claimant is also very functional. It is noted the claimant was able to perform all the requested activities. It is also noted that she is able to take care of herself, able to go to her doctor's appointments, etc., and in fact it does not seem to be that she is taking any pain medications.

Based on that, the number of hours the claimant could be expected to stand and walk in an eight-hour workday is eight hours. The number of hours the claimant is expected to sit in an eight-hour workday is eight hours. An assistive device is none. The amount of weight the claimant could lift [i.e., upward pulling – *see* AR 195] and carries occasionally is 100 pounds and frequently 50 pounds. She has no postural limitations on bending, stooping, crouching and she should be able to do that frequently. She should not have any [*sic*] manipulative limitations of reaching, handling, feeling, grasping, and fingering in spite of her refusal to move her upper arms freely. It is noted that she was able to use her arm getting in and out of a chair or getting up on the table and leaning on them when required suggestive [*sic*] that she should not have any manipulative limitations whatsoever. Similarly, she does not have any relevant visual, communicative, or workplace's environmental limitations. The claimant's maximum functional capacity is rated as heavy with no limitations. (AR 193).

(d)    Dr. Bobba's opinion

On April 26, 2005, State agency physician, Dr. Lavanya Bobba, provided an opinion of Plaintiff's medical status. (AR 202-204). Dr. Bobba reviewed records but did not examine Plaintiff. The alleged impairments described in the consultation request were pain in Plaintiff's neck, arms, hands, chest, knee and feet with sleeplessness.[8] (AR 202). The request mentioned allegations that symptoms have worsened since August of 2004. (*Id.*) Initial symptoms were described as "[c]onstant, intense pain; numbness; sleeplessness. Hurts to type, write, sit up for long periods of time. No strength and often drops things. Pain/numbness, and tingling in neck, arms, and both hands. Painful to do normal activities; writing, blow-drying hair, reaching above shoulders, etc. Constant. Can't sit comfortably; repositions often. Drops things; loses balance and no strength." (AR 202). Symptoms emerging since the initial assessment (i.e., October 2004) included "fatigue,

---

[7] Cervical here refers to the neck areas. Rothenberg and Chapman, *Dictionary of Medical Terms,* 115 (5th ed., 2006).

[8] The "Disability Determination and Transmittal Form" associated with this consultation request gives as the "primary diagnosis" "myoneural disorders." (AR 30). "Myoneural" is defined as "relating to both muscle and nerve" in *Stedman's Medical Dictionary*, 1274 (2006 edition).

morning stiffness, headaches." (*Id.*)

The consultation request also summarized the medical history and objective findings for the period beginning June of 2003 through Dr. Bhangoo's consultative exam on March 24, 2005. (AR 202-203). The report described the functional restrictions Dr. Young had identified along with those assessed by Dr. Bhangoo. (*Id.*)

In terms of Plaintiff's credibility, the consultation request noted that Plaintiff was considered partially credible based on allegations that are not fully supported by the objective medical evidence in the file. (AR 204). Under "Conflict or Inconsistencies," the agency reported that Dr. Young's conclusions of a less than sedentary residual capacity was based on subjective rather than objective evidence. (*Id.*) As to the weight to be given to Dr. Young's opinion, the agency staff noted that his assessment is too restrictive based on subjective and not the objective medical evidence in the file. (*Id.*) The recommendations and conclusions of staff were that Plaintiff did not meet or equal listings 1.02, 1.03, 1.04, 14.06, 14.09 , or any other listings. (*Id.*) "It appears that claimant would be able to do light exertion w/o additional limitations as noted in the initial RFC and affirmation appears appropriate. Agree?" (*Id.*) Dr. Bobba handwrote, "Affirm initial decision." (*Id.*) By way of explanation, Dr. Bobba noted that although Dr. Young gives an initial diagnosis of fibromyalgia ... his exams are not consistent with [two illegible words] and later indicates no secure diagnosis and non-specific pain. [Dr. Young's assessment of residual functional capacity] of 3/16/05 is too restrictive and not supported by his [medical evidence], hence controlling weight cannot be given. Initial light RFC is still appropriate." (AR 204). Dr. Bobba did not submit a Physical Residual Capacity Assessment.

### B.    *Adult Third Party Information*

Mary Reynolds, Plaintiff's mother, prepared an adult function report dated January 15, 2005. (AR 117-125). Mrs. Reynolds reported that she did not have full knowledge of what her daughter did throughout the day but she did state that her granddaughter, Plaintiff's daughter, assisted Plaintiff with care of the family pets. (AR 118). She reported that prior to Plaintiff's condition, Plaintiff was able to garden, drive and do things around the house, activities that she could no longer do. (*Id.*) Mrs. Reynolds reported that the pain wakes her daughter up; that her daughter has trouble fastening

buttons; that her daughter's ability to care for her hair may be affected because Mrs. Reynolds sees her daughter wearing hats "all the time." (*Id.*) Mrs. Reynolds indicated that Plaintiff's ability to feed herself has also been affected by Plaintiff's condition. (*Id.*)

With respect to household duties, Mrs. Reynolds reported that her daughter cooks weekly and prepares sandwiches, pasta and other meals in the "crock pot." (AR 119). She does not cook as much as she used to, according to Mrs. Reynolds. She also reported that Plaintiff did some laundry and dusting which took her a couple of hours each week and did them with her granddaughter's assistance. (*Id.*) Her daughter went outside infrequently, could walk, drove a car a very short distance, and could ride in the car. (AR 120). Her daughter shopped for groceries but took her granddaughter with her for assistance. Mrs. Reynolds estimated it took them about an hour or less to do this shopping. (*Id.*)

According to Plaintiff 's mother, most of the time her daughter watched television some part of the day but her daughter had no hobbies. (*Id*.) Her daughter used to play sports, read, go to the mall, and go to the movies. (AR 121). Accordingly to Mrs. Reynolds, her daughter's present social activities consisted entirely of talking on the phone with her mother every day, and she had become a "home body." (AR 121-122).

Since her illness, Plaintiff has had trouble lifting, squatting, sitting, kneeling, stair-climbing, bending, standing, reaching, walking, and using her hands, according to Mrs. Reynolds. (AR 122). Mrs. Reynolds estimated that her daughter could carry less than five pounds, walk only one block or so before needing to rest, and needed to ten to twenty minutes before being able to resume walking. Mrs. Reynolds closed her report by noting that her daughter "is in pain all the time. If she stands and someone brushes against her  that hurts her  you see it in her face. She tries to do some simple things." (AR 125).

### C.     *Hearing Testimony*

As noted earlier, at the November 15, 2006 hearing, Plaintiff was not assisted by a representative or an attorney. The ALJ advised  Plaintiff that she could  represent herself but that she had the right to contact an attorney or a representative to assist her in this matter. (AR 282). Plaintiff responded that it was her intention to proceed without assistance.

The ALJ explained what Plaintiff's burdens of proof were and provided a definition of "medically determined impairment." (*Id.*) The ALJ explained that in making a disability determination, factors such as her age, education, past work, medical treatment, and something else that was not audible were considered. (*Id.*) There was another moment of inaudible instructions, followed by the words, "over the documents we have on that issue." (*Id.*) The ALJ states that the matter is "a Title 2 case" (*id.*) and, from the context immediately surrounding another burst of inaudibility, it appears that the ALJ explained what Title II meant. (AR 283). The ALJ goes on to describe some portion of the records that are relevant to the decision-making process, however portions of the discussion were inaudible. The ALJ also explained that "[during the course of the hearing, I'll go over your medical condition. If I feel [INAUDIBLE] the record, because that is what happens is when you file a request for hearing it goes through a medical audit." (AR 283). Plaintiff said, "Oh" and the ALJ continued with, " So I will order those records, basically 2004 up to the present [INAUDIBLE]." (*Id.*)

After these advisals, the ALJ began the evidentiary process. The only exhibit formally admitted into evidence at the hearing was the consultative examiner's report prepared by Dr. Bhangoo. (AR 283, 280-301). Vocational expert, Kenneth Ferra, was present at the hearing; both he and Plaintiff were sworn in as witnesses. (*Id.*)

Plaintiff testified as to her date of birth; her current height and weight; her educational history; her present sources of personal income or assistance; her literacy skills; her mental health condition; and her employment history, or portions thereof, along with her job responsibilities in these various positions and what the physical requirements of those jobs were. She explained the latter as mostly, sitting at a desk most of the day, lifting things like filing boxes, maybe as much as 20 pounds in weight. (AR 284-287). The ALJ asked the vocational expert if he had "any questions about potential [INAUDIBLE]." (AR 287). Mr. Ferra responded "no." (*Id.*) The ALJ then asked the Mr. Ferra to "classify it [INAUDIBLE] and exertional level." (*Id.*) Mr. Ferra's response was "[accounting clerk, sedentary and skilled." (*Id.*) When the ALJ asked Plaintiff why she stopped work, she replied that she couldn't sit at a desk anymore, she couldn't write, she couldn't move her neck in ways that were apparently required in the work, and she couldn't use the computer. (*Id.*)

"My hands are number constant." (*Id.*)

The ALJ shifted his attention to Plaintiff's alleged disabling condition. In response to the ALJ's question, Plaintiff testified that she had been diagnosed with fibromyalgia. (AR 288). The ALJ listed various conditions that had been ruled out in reaching the diagnosis of fibromyalgia, including multiple sclerosis and potential spinal problems. (*Id.*) Plaintiff described her symptoms as:

> Hands are numb, I can't feel anything, I drop, my neck is stiff, my arms are stiff. It's ... like the flu symptoms about 1,000 times worse and it's constant. My husband bought me a special ... reclining chairs because I can't physically lay down because it hurts worse. I spend time in the spa because of heat. I can't do cold. ... And I can't do anything I used to do. (AR 288-289).

Plaintiff testified that her symptoms started in about 2002. (AR 289). She explained that she was covered by Kaiser insurance through her husband, that she went first to Dr. Ramnani and then to Dr. Young, a specialist, on the basis of a referral from Kaiser. (*Id.*) She testified that she had been seeing Dr. Young since that time. Plaintiff also explained that she had been on state disability for about a year when her coverage limits were met. (*Id.*)

The ALJ asked Plaintiff about the medications she took to manage her condition. The ALJ's precise question is unknown because of audibility problems. (AR 289). Plaintiff's response was, "Present. Yes. He changed me from my Neurontin and Nortriptyline to the new drug Allegra."[9] (AR 289). Plaintiff testified that she had been taking the new drug for about 2 months; that there had been some improvement with it; and that it helped her sleep better at night. (*Id.*) The last time Plaintiff saw Dr. Young he increased the dosage. (*Id.*)

Plaintiff then asked the ALJ about what medical records were in the file, specifically medical records from 2006. (*Id.*) "So you have nothing in there from [sic] 2006?" (*Id.*) The ALJ explained the process of gathering a complete medical record history, advising that no additional records are gathered until after an appeal is filed and the AJL gets the case. (*Id.*) Then, if represented by counsel, Plaintiff's attorney gathers the additional records. If there is no attorney, as in this case, then the ALJ orders the records. (*Id.*) Plaintiff 's response was, "Okay. Because I had sent copies ...

---

[9]The Court surmises that Plaintiff may have said "Lyrica," not Allegra, as reported in the transcript.

22

of ... my visits when I went to him [Dr. Young].  A little sheet you get for the receipt type thing.

And ... a copy of my prescriptions.  And, of course, a letter." (*Id.*)  The exchange continued as

follows:

Q:  You sent that, you sent that to us?  (AR 290).

A:  Yes.  (*Id.*)

Q.  I got nothing [INAUDIBLE] June 6th [INAUDIBLE].  (*Id.*)

A:  Okay.  No, I, I just [INAUDIBLE],  Dr., Dr. Beck [phonetic].[10]  (*Id.*)

Q.  About how long ago?  (*Id.*)

A:  I just sent one.  (*Id.*)

Q:  Okay.  Well, this, okay.  I got copies of the prescriptions for the Nortriptyline and the

Allegra [*sic*].  (AR 291).

A:  Because I sent some back with the, the acknowledgment for the receipt of the hearing.

(*Id.*)

Q:  All right. (*Id.*)

A:  And it had the two copies of my recent visits to the doctor.  It's [INAUDIBLE].  That –
(*Id.*)

Q:  That I don't see.  (*Id.*)

A:  That was 8/22.  (*Id.*)

Q:  [INAUDIBLE].  (*Id.*)

A:  That a recent one, but I had previous ones too. (*Id.*)

Q:  I got that and I got that [*sic*].  (*Id.*)

A:  You probably should have that.  (*Id.*)

Q:  I've got that.  (*Id.*)

A:  So you got it all.  You got the packet?  (*Id.*)

Q:  [INAUDIBLE.]  (*Id.*)

A:  Oh, good.  (*Id.*)

---

[10]  This Court can find no names of physicians in the entire administrative record that sound like "Beck."

23

Q: That's supposed to be – (*Id.*)

A: We didn't kill a tree. (*Id.*)

Q: [INAUDIBLE.] (*Id.*)

A: Okay. (*Id.*)

Q: [INAUDIBLE.] (*Id.*)

Q: But there are, there are other records besides those.[11] [INAUDIBLE.]? ( AR 291-292).

A: Yeah. He does a sheet that ... looks like this too that goes in my file there, but then the one that you have there also is in my file, but he has ... notes. (AR 292).

Q: Right. But how often are you going there? (*Id.*)

A: About four to five weeks. Every four to five weeks. (*Id.*)

Q: Yeah. I [INAUDIBLE]. I've [INAUDIBLE]." (*Id.*)

A: There was a little [INAUDIBLE] there from October/February when I was having trouble with Kaiser because they weren't going to give me my referral. (*Id.*)

Q: [INAUDIBLE]. (*Id.*)

A: And it's like I've been going to him for years. It's a, it's a normal routine. Yeah. So, because I used to get, when I would go, they would send me the referral and I would get it in the mail. Well, that has apparently stopped. They contact the doctor and the doctor's supposed to call with the referral and then we schedule the appointment. There was confusion there, I believe. I believe it was Kaiser. They send you the bills though. (*Id.*)

The ALJ next turned to questions regarding the impacts Plaintiff's condition had on her activities of daily living, on an average day. (AR 292). Plaintiff testified that, on an average day, she did really nothing. (*Id.*) Her 11-year-old sixth grade daughter gets up, gets herself ready for school, and is out the door to the bus. (AR 292-293). Plaintiff testified that "I maybe pickup a little bit, but I basically watch TV." (AR 292). Plaintiff testified that her husband "goes to work early so he's home by 2. So. It's very kind of depressing. You can't do things that you used to do, bicycle rides, snow boarding, roller blading, you know." (AR 293). She testified that she cannot take a trip because she cannot ride in a car for very long. (*Id.*)

///

---

[11] Because nothing but Dr. Bhangoo's consultation report was received into evidence or otherwise marked for identification during the course of the hearing, and no detailed description of the particular document under discussion is provided, it is unclear as to what documents they were discussing.

When asked what her worst symptom was, Plaintiff said it was the constant lack of feeling in her hand. (*Id.*) Plaintiff testified also that she experienced neck problems related to the hands in that it begins in her neck, goes to her shoulder blades. (*Id.*) In answering a question that was reported as "inaudible," Plaintiff said, "Sometimes you can grab it and then I'll squeeze it [*sic*] and break the glass because you [*sic*] don't know your own strength, I think. I can burn myself on the stove. At night, I grab my hands and I have nails into my hand and I wake up with the, with this." (*Id.*) Another inaudible question from the ALJ follows. (*Id.*) Plaintiff responds to whatever the question was by saying, "It's just very frustrating because I am used to doing things." (*Id.*) Plaintiff described the symptoms in her neck as "a stiff, constant pain, like little pins sticking in you." (*Id.*) And in order to mitigate the neck symptoms, Plaintiff had to sit a certain way. (*Id.*)

The ALJ asked Plaintiff another inaudible question relating to meal preparation, to which Plaintiff's response was, "If it's in the microwave. My husband barbecues a lot. So he cooks a lot [*sic*] or we eat out." (AR 294). Plaintiff also testified that she suffers from fatigue because she only sleeps three to four hours a night. She explained that she can tolerate heat very well but cold not at all. (*Id.*)

The ALJ next asked Plaintiff about Dr. Bhangoo. (AR 295). The Court is obliged to assume the general subject matter of the question based on the Plaintiff's response, because the hearing transcript reports the question as "INAUDIBLE." Plaintiff was highly critical of Dr. Bhangoo. Plaintiff testified that her husband drove her to the appointment and she arrived early, to accommodate a change in Dr. Bhangoo's schedule. (AR 297). The medical assistant took Plaintiff's blood pressure and did a vision test. (AR 296). Plaintiff told the nurse what her height and weight were. (*Id.*) Plaintiff did not complete a medical history form at any time during the visit. (*Id.*) Plaintiff was then escorted into the doctor's office. (AR 295). Plaintiff testified that Dr. Bhangoo was on his cell phone at that time and took or made two other phone calls before he turned his attention to Plaintiff. (*Id.*) Plaintiff described the full extent of the examination as: "[H]e asks me what's my problem. I briefly explained to him ... [that] I'm numb all the time, constant pain, pins and needles, I can't ... do the things I used to do . . . my doctor's diagnosed it [as] fibromyalgia, gave him, told him my medication. Okay. That's it. And he concluded. He didn't touch me." (AR 295-

296.)  Plaintiff testified that the entire visit lasted five minutes. (AR 296).

The hearing transcript indicted that the ALJ next focused on gathering missing medical records.  (AR 297-300).  He instructed Plaintiff to contact Kaiser for copies of all medical records from January 2004 to the present and have those sent to him.  (*Id.*).  Additionally, the ALJ instructed Plaintiff to obtain from Dr. Young any records for the period beginning July 28, 2004 through December 15, 2004 and to have those records sent to the ALJ.  (*Id.*)  Plaintiff agreed to do this, and the hearing was concluded. (AR 300).

**D.**     ***The ALJ'S Findings and Analysis***

The ALJ found that Plaintiff had fibromyalgia, a severe impairment, which significantly limited Plaintiff's ability to perform basic work activities; that this impairment did not meet or equal one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1; and that Plaintiff had the residual functional capacity to perform the exertional demands of light work, or work which required maximum lifting of 20 pounds and frequent lifting of 10 pounds.  (AR 24).  The ALJ found no other exertional or non-exertional restrictions.  (*Id.*)  In arriving at this conclusion, the ALJ found that Plaintiff's medically determinable impairment could reasonably be expected to produce her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  (*Id.*)

Apparently central to the ALJ's credibility conclusion, as well as to his broader residual functional capacity finding, were the following considerations: (1) Plaintiff's treating physicians, Dr. Young, found no secure diagnosis on multiple occasions and that it was not early 2006 that the diagnosis of fibromyalgia was reached; (2) the daily activities in which Plaintiff engaged, according to her Adult Function Report, were "consistent with the performance of at least light work on a maximum sustained basis" (AR 25); (3) the Adult Function Report provided by Plaintiff's mother described some daily activities that Plaintiff could perform , i.e., simple meal preparation, light housework, grocery shopping, driving a car, but the third party's descriptions of Plaintiff's exertional and postural limitations were given little weight because they were not quantified; (4) Dr. Young's medical source statement dated March 16, 2005, indicating limitations that would preclude substantial gainful activity, was inconsistent with his previous statement that Plaintiff  was only

disabled for four additional weeks in November 2003; (5) Plaintiff had not required any hospital or emergency care for her condition; (6) the newer medication Plaintiff was taking was "helpful" (AR 25); "[t]he medical findings in this case [were] essentially nil"; (7) the opinion of Dr. Young was rejected because it was "largely based on Plaintiff's own subjective complaints rather than on objective medical findings which are minimal, at best" (AR 25); and (8) the opinions of the Disability State Agency consultants, Drs. Bugg and Bobba,[12] that Plaintiff could perform light work, were afforded substantial weight.[13] (AR 24-25).

## DISCUSSION

### A.   *The Alleged Inadequacy of the Administrative Record*

Plaintiff contends that the administrative record is incomplete. According to Plaintiff, not all the documents she submitted during the administrative portion of these proceedings are contained in the record, and the transcript of the September 14, 2006 administrative hearing is missing portions of her testimony. (OB at p. 4).

It is true, as the Commissioner argues, that Plaintiff has failed to cite any legal authority for her claim of error in this regard. Nevertheless, this Court will not ignore the provisions of 42 U.S.C. § 405(g), particularly in those relatively unusual cases where a litigant, not trained in the law, chooses to represent herself.

Where an unsuccessful applicant pursues judicial review of the Commissioner's final administrative decision under the Act, the third sentence of 42 U.S.C. § 405(g) requires that, as part of the Commissioner's answer to the complaint, the Commissioner must file a certified copy of the transcript of the record including the evidence upon which the findings and decisions complained of are based. Logic dictates that an incomplete record, omitting portions of the evidence alleged to be material, would not suffice to meet the Commissioner's obligation under this portion of the statute. However, in this case, Plaintiff has not demonstrated precisely what portions of her documentary

---

[12] We know the names of these two doctors because of the reference to Exhibits 2F and 5F when the ALJ identified the State Agency physicians to whose opinions he gave substantial weight. (AR 25).

[13] Although the ALJ does briefly discuss some aspects of Dr. Bhangoo's examination, as well as his conclusions regarding Plaintiff's residual functional capacities to perform work-related activities, it does not appear from the ALJ's decision that he gave any weight to this doctor's opinion. (AR 24-26).

evidence were omitted and whether those omitted documents were part of the case record.

Consequently, we cannot conclude the omissions were material and, even if we were able to do so,

we cannot fashion a remand order specifying inclusion of unidentified records.

Plaintiff also alleges that portions of her testimony are missing. A review of the hearing

transcript demonstrates that this claim has some facial merit. However, as disjointed and confusing

as several portions of the testimony are, this Court's close and careful review of the entire record

leads to the conclusion that material omissions are not present.

For both these reasons, the Court concludes that there has not been a sufficient demonstration

that the Commissioner has failed to meet the obligation imposed on him by sentence three of Title 42

U.S.C. § 405(g).

**B.**     ***The ALJ's Determination that Plaintiff is Not Disabled is not Supported by***
         ***Substantial Evidence***

Plaintiff argues that substantial evidence does not support the ALJ's disability determination.

Her argument is based on her contentions that (1) the ALJ improperly discredited Dr. Young's

opinion, and (2) the ALJ improperly discounted Plaintiff's reports and testimony regarding her

subjective complaints. The Court agrees with Plaintiff.

1.     The ALJ's Consideration of Dr. Bhangoo's Opinion

As noted earlier, the opinions of four physicians were involved in the ALJ's disability

determination, as the ALJ has explained it.[14] Dr. Bhangoo, a non-treating but arguably examining

State Agency physician, rendered one of those opinions. However, Dr. Bhangoo's opinion does not

appear to have influenced the ALJ's decision in any articulated way. (*See* AR 21-26).

2.     The ALJ's Consideration of the Remaining Physicians' Opinions

The remaining three physicians included Drs. Bugg, Bobba, and Young. Drs. Bugg and

Bobba were State Agency physicians, of unknown specialty, who did not examine Plaintiff and,

certainly, did not treat her. Both Drs. Bugg and Bobba concluded that Plaintiff retained the residual

functional capacity to perform light work. Dr. Rolando Young was the board certified neurologist

_____

[14]  There are no other physicians mentioned in the ALJ decision nor are there opinions or findings from any
other physician substantively discussed in the decision. (AR 21-26).

28

who treated Plaintiff for her fibromyalgia condition.  In March of 2005, Dr. Young opined that the impacts of Plaintiff's fibromyalgia severely restricted her abilities to perform basic work-related activities.  There are significant inconsistencies in these various medical source opinions.

The ALJ gave substantial weight to the opinions of Drs. Bugg and Bobba (AR 25) and rejected Dr. Young's opinion, apparently in its entirety.  (*Id.*)  The ALJ dismissed Dr. Young's opinion because his March 2005 opinion was inconsistent with his earlier opinion of November 2003; because his opinion was "largely based on [Plaintiff's] subjective complaints rather than on objective medical findings"; and because the objective medical findings "were minimal at best." (*Id.*)

(a)     The ALJ's Consideration of Dr. Bugg's Opinion

The Court begins its analysis with an evaluation of the legal sufficiency of the ALJ's treatment of the State Agency physician's opinions.  Dr. Bugg based his October 22, 2004 conclusion that Plaintiff retained the functional capacity to perform light work on a review of Plaintiff's medical history and the objective medical findings over the period beginning in June 2003 and ending in May 2004.  It is not clear from Dr. Bugg's opinion whether he understood that Plaintiff's working diagnosis was fibromyalgia.  (AR 221).  Dr. Bugg indicates there were no treating or examining source statements in the file.  (AR 200).  Dr. Bugg failed to state how he reached his conclusion as to Plaintiff's ability to perform light work.  It appears that he reviewed the consult report that accompanied the requested opinion for an "RFC" and that consult report focused heavily on the lack of objective medical findings and the absence of a secure diagnosis.  (AR 150-151).  Curiously, and seemingly contradictorily, Dr. Bugg also concluded that "[t]he severity of the [Plaintiff's] symptom(s) [i.e., constant intense pain in neck, arms and hands] and its alleged effect on function [pain, numbness, tingling from neck, arms and hands; painful when doing normal activities such as writing, blow drying, dressing, or reaching above shoulders; can't sit comfortably, need to change position often; drop things, periodically lose balance and have no strength; seem[s] worse at night and wake[s] up often – see AR 150) [was] consistent, in [his] judgment, with the total medical and non-medical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits."  (AR199).

Given Dr. Bugg's conflicting assessments, his opinion is internally inconsistent. Consequently, its utility in reaching a conclusion about Plaintiff's residual functional capacity seems questionable at best, and at a minimum, the weight assigned to its value is suspect. Substantial evidence is not *any* evidence. Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citations omitted). Based on that guideline, Dr. Bugg's opinion is not substantial evidence for the ALJ's conclusion regarding Plaintiff's residual functional capacity.

(b)     The ALJ's Consideration of Dr. Bobba's Opinion

The ALJ also gave substantial weight to Dr. Bobba's opinion dated April 26, 2005. (AR 25). As mentioned earlier, Dr. Bobba was another State agency physician, who provided an opinion on various aspects of this case. (AR 202-204). Dr. Bobba reviewed records but did not examine Plaintiff. As discussed above, Dr. Bobba's handwritten opinion states: "Affirm initial decision." (AR 204). By way of explanation, Dr. Bobba notes that "[a]lthough [Dr. Young] gives an initial diagnosis of fibromyalgia ... his exams are not consistent with [*two illegible words*] and later indicates no secure diagnosis and non-specific pain. [Dr. Young's assessment of residual functional capacity] of 3/16/05 is too restrictive and not supported by his [medical evidence], hence controlling weight cannot be given. Initial light RFC is still appropriate." (*Id*.)

Dr. Bobba's conclusion that Dr. Young's opinion was entitled to no controlling weight appears to be based on an inadequate understanding of fibromyalgia, a working diagnosis of which Dr. Bobba was aware. (*See* AR 203). The opinion in *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) is particularly apposite here. The opinion instructs:

> Fibromyalgia, previously called fibrositis, [is] a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. *See e.g.*, *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc*., 125 F.3d 794, 796 (9th Cir. 1997); *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003). Common symptoms, all of which Benecke experiences, include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. *See Brosnahan*, 336 F.3d at 672 n.1; *Cline v. Sullivan*, 939 F.2d 560, 563 (8th Cir. 1991). Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other

30

symptoms. The American College of Rheumatology issued a set of
agreed-upon diagnostic criteria in 1990, but to date there are no laboratory
tests to confirm the diagnosis. *See Jordan v. Northrop Grumman Corp.*,
370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan,* 336 F.3d at 672 n.1.

*Benecke*, 379 F.3d at 589.

Also useful in understanding how fibromyalgia is to be evaluated in disability cases is the

opinion in *Jordan v. Northrop*, 370 F.3d 869 (9th Cir. 2004.)

As we have previously explained, fibromyalgia's cause or causes are
unknown, there is no cure, and, of greatest importance to disability law, its
symptoms are entirely subjective. There are no laboratory tests for the
presence or severity of fibromyalgia. "The 'consensus' construct of
fibromyalgia identifies the syndrome as associated with generalized pain
and multiple painful regions . . . . Sleep disturbance, fatigue, and stiffness
are the central symptoms," though not all are present in all patients. The
only symptom that discriminates between it and other syndromes and
diseases is multiple tender spots, which we have said were eighteen fixed
locations on the body that when pressed firmly cause the patient to flinch.
The diagnosis is now based on patient reports of a history of pain in five
parts of the body, and patient reports of pain when at least 11 of 18 points
cause pain when palpated by the examiner's thumb. Although the Mayo
Clinic states that the syndrome is neither "progressive" nor "crippling,"
the symptoms can be worse at some times than others. Objective tests are
administered to rule out other diseases, but do not establish the presence or
absence of fibromyalgia. [¶] Objective physical signs, laboratory results,
and x-ray results are generally negative, and "because the majority of
patients appear tense and anxious and have no recognizable objective basis
for symptoms, the syndrome is often considered psychogenic." This
Court, however, has recognized fibromyalgia as a physical rather than a
mental disease. (Internal citations omitted.)

*Jordan*, 370 F.3d at 872-873.

As these authorities make clear, the lack of medical findings cannot serve as the basis for

discounting or discrediting the validity of Dr. Young's medical opinion. It is error to effectively

require "objective evidence" for a disease that eludes such measurement. *Benecke*, 379 F.3d at p.

594, citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (reversing and remanding

for an award of benefits where the claimant was disabled by fibromyalgia). Consequently,

Dr. Bobba's conclusion that Dr. Young's opinion was entitled to no controlling weight (AR 204) –

the only reason Dr. Bobba articulates for a residual functional capacity finding of light work – is not

a legitimate basis for rejecting Dr. Young's opinion; the lack of objective medical evidence is quite

consistent with the nature and symptoms of fibromyalgia. *Benecke*, 579 F.3d at p. 594. That was

error. Moreover, to the extent that Dr. Bobba finds significance in the lack of a secure diagnosis

over some period of time, it - again - misunderstands the nature of this condition. "Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." *Jordan*, 370 F.3d at p.872. A "secure" diagnosis of fibromyalgia appears to be reached over a period of time, as other possibilities are ruled out and more evidence about symptoms emerge.

There is another reason to conclude the ALJ erred in assigning substantial weight to the opinions of Drs. Bugg and Bobba. They were both non-examining physicians and they relied on the same findings that Dr. Young relied on in reaching his opinion. Neither Dr. Bobba nor Dr. Bugg conducted any independent testing or relied on independent findings.[15] Neither offered a differing diagnosis of Plaintiff's condition. Given the inherently improbable conclusion reached by Dr. Bhangoo, i.e., that plaintiff "could perform up to even heavy work" with no postural or manipulative limitations (AR 204), and the extremely questionable process by which he arrived at them, as well as the fact that objective medical testing is useful in diagnosing fibromyalgia only to "rule out" other diseases (*see Jordan* 370 F.3d at 872 – "[o]bjective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia"), it is difficult to find a rationale that might support the conclusion that the opinions of Dr. Bugg and Dr. Bobba, either individually or jointly, constituted substantial evidence. *Cf. Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990) and *Gallant v. Heckler*, 753 F.2d 1450, 1454 (9th Cir. 1984).

Even if either or both of these medical opinions constituted substantial evidence, "[t]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. [Citations omitted.]" *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996). The ALJ may reject a treating or examining physician's opinion, even if contradicted by another physician, if he or she provides specific, legitimate reasons based on substantial evidence in the record. *Lester*, 81 F.3d at pp. 830-831; *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Magallanes v. Brown*, 881 F.2d

---

[15] "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and are supported by substantial evidence . . . or (2) findings based on objective medical tests that the treating physician has not herself considered." *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007).

747, 751-755 (9th Cir. 1989).  That does not appear to have occurred here.

(c)    The ALJ's Rejection of Dr. Young's Opinion

The ALJ's articulated rationale for assigning no weight to Dr. Young's opinion was three-fold: Dr. Young's reliance on Plaintiff's subjective complaints rather than on objective medical findings; the lack of objective medical evidence; and the inconsistencies between Dr. Young's November 2003 report regarding the expected duration of Plaintiff's disability and his opinion set forth in his March 2005 report.  Reliance on the lack of objective medical findings as a justification for not crediting Dr. Young's opinion was improper, as previously discussed.  In cases involving fibromyalgia, "[o]bjective physical signs, laboratory results, and x-ray results are generally negative." *Jordan*, 370 F.3d at p. 872.   As noted earlier, it is error to effectively require "objective evidence" for a disease that eludes such measurement.  *Benecke*, 379 F.3d at p. 594.  Dismissing Dr. Young's opinion because it was based largely on Plaintiff's subjective complaints, without more, was also error because *that is how fibromyalgia is diagnosed*.  "[Fibromyalgia] is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Id.* at p. 590. The supposed inconsistency between Dr. Young's two reports, one dated November of 2003 and the other dated March of 2005, is all that is left to provide substantial evidence for the ALJ's conclusion that Dr. Young's opinion is entitled to no weight.  And, here, it is at best a flimsy reed.

The ALJ characterizes Dr. Young's statement in the earlier report as saying that Plaintiff "was only disabled for 4 additional weeks in November, 2003." (AR 25).  Actually, the note at the bottom of the charting entry reads, in its entirety, "off work on disability 4 more weeks."  (AR 222).  The entire charting entry for that visit provides no context for interpreting the doctor's notation and, without more, it is not reasonable to infer such a meaning from this bare-boned statement.  At a minimum, the ambiguity should have prompted the ALJ to more fully develop the record on this point, given the heavy reliance he placed on his interpretation of the physician's words in reaching the disability conclusion.

An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when "the record is inadequate to allow for proper evaluation of the evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  "In Social Security cases the ALJ has a special duty to

33

fully and fairly develop the record and to assure that the claimant's interests are considered.

*Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir. 1982). This duty exists even when the claimant

is represented by counsel. *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983.) And there is a

heightened responsibility when a claimant is not represented by counsel or not assisted by a

representative. *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *Celaya v. Halter*, 332 F.2d 1177,

1183 (9th Cir. 2003).

> The ALJ is not a mere umpire at such a proceeding, but has an
> independent duty to fully develop the record, especially where the claimant
> is not represented: … it is incumbent upon the ALJ to scrupulously and
> conscientiously probe into, inquire of, and explore for all the relevant
> facts. He must be especially diligent in ensuring that favorable as well as
> unfavorable facts and circumstances are elicited. (Citations and internal
> quotation marks omitted.)

*Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1991).

The ALJ's conclusion constituted error for others reasons as well. Even had there been

substantial evidence in this record from another physician sufficient to contradict Dr. Young's

opinion, all that would mean is that Dr. Young's opinion would not have been entitled to

"controlling weight." 20 C.F.R. § 404.1527(d)(2). In such a situation, the ALJ is instructed by

Section 404.1527(d)(2) to consider the factors listed in subparagraphs (d)(2)-(6)[16] in determining

what weight to accord the opinion of the treating physician. No such discussion occurred in the

ALJ's ruling under review, although he had concluded that Dr. Young's opinion was contradicted

by, or inconsistent with, the opinions of Drs. Bugg and Bobba. (AR 21-26). And, finally, the ALJ's

treatment of Dr. Young's conclusion is flawed because there appears to be no deferential treatment

of Dr. Young's assessment. Even if contradicted by the opinion of other physicians, the treating

physician's opinion is still entitled to deference. *Orn*, 495 F.3d at p. 632-633.

The Commissioner argues that the ALJ's conclusion is essentially correct because there is no

evidence in this record that, when Dr. Young concluded Plaintiff suffered from fibromyalgia, he did

so based on an examination of Plaintiff's response to pressure on the requisite tender points. One of

---

[16] These include length of the treatment relationship and the frequency of examination;
nature and extent of the treatment relationship; supportability; consistency; specialization; and other
factors. (*Id.*)

the problems with this argument is that it is not a basis upon which the ALJ relied in making his decision.  This Court cannot affirm the ruling on grounds the ALJ did not consider and analyze.  "We are constrained to review the reasons the ALJ asserts.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947); *Pinto v. Massanari*, 249 F.3d 840, 847-848 (9th Cir. 2001).  It [is] error for the district court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss."  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

**C.** **_The ALJ's Determination of the Credibility of Plaintiff's Subjective Complaints_**

Plaintiff has also argued that the ALJ did not properly consider her subjective complaints about her symptoms and their limiting functional effects.

There is no affirmative evidence that Plaintiff is malingering.  And the record demonstrates that Dr. Young's diagnostic process was proper and that his diagnosis was reached as a result of the use of this process.  As discussed in *Jordan* and *Benecke,* fibromyalgia, the condition from which Plaintiff suffers, could reasonably produce the symptoms of which Plaintiff complains.  *Jordan*, 370 F. 3d at 872-873; *Benecke*, 379 F. 3d at 589.  Under these circumstances, an adverse credibility finding must be based on clear and convincing reasons.  *Carmickle v. Commissioner, Social Security Administration*, 533 F.3d 1155, 1160 (9th Cir. 2008).

The ALJ discounted substantially the value of Plaintiff's subjective complaints when reaching a conclusion on the disability issue.  The ALJ did so for several reasons – despite Plaintiff's complaints of pain, numbness and stiffness, an extensive work-up of Plaintiff's condition was essentially negative; "the medical evidence in this case found [was] essentially nil"; Plaintiff had recently been started on a new medication (Lyrica) that was proving helpful; that Plaintiff had never required any hospital or emergency care related to her condition; and that Plaintiff could do some of the activities involved in meeting the demands of daily living.  (AR 25).  As a result of these considerations, the ALJ determined Plaintiff's credibility to be poor on the issue of whether Plaintiff is totally precluded from performing any sustained work activities.  (*Id.*)

While clear, these are not convincing reasons, at least not insofar as the record contains substantial evidence for their support.  Again, the lack of objective medical evidence – a factor that seems to be a weighty consideration for the ALJ overall – cannot form the basis of a "substantial

35

evidence" finding in cases involving fibromyalgia. *Benecke*, 379 F.3d at p. 594. Similarly, the absence of any other conditions discovered during an extensive work-up of Plaintiff's condition is one of the diagnostic hallmarks of the condition. The evidence that Lyrica was proving helpful to Plaintiff consisted of testimony that Plaintiff was better able to sleep at night; no other improvements in her condition were noted as a result of taking Lyrica. (AR 29). The fact that Plaintiff had not been hospitalized or sought emergency treatment for her condition is not instructive. Without evidence that fibromyalgia often or normally requires emergent care or hospitalization, which is not in this record, it is difficult to draw any reasonable inferences from this one fact. (*Cf. Smolen v. Chater*, 80 F.3d 1273, 1286 (9th Cir. 1996) regarding the ALJ's failure to explain what his referenced inferences would have been and in what way they would have been contrary to the opinions the physicians offered.) Nor can it fairly be considered a "convincing justification" for rejecting Plaintiff's subjective complaints of pain and other symptoms. *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989).

As for Plaintiff's efforts to meet some of the demands of normal daily living, the minimal amount of activity Plaintiff was able to perform does not detract in any way from her credibility as to her overall disability. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). There are two grounds for using a claimant's daily activities to form the basis for an adverse credibility determination, i.e., when his or her other testimony contradicts a claimant's description of his or her daily activities or when a claimant's daily activities meet the threshold for transferable work skills. *Orn*, 495 F.3d at p. 639. Neither of those grounds is present in this case. First, there is no significant contradiction between Plaintiff's description of her daily living activities and her testimony[17]; second, as she described them, Plaintiff's activities do not meet the threshold for transferable work skills.

*Fair* instructs that daily activities may be grounds for an adverse credibility finding "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance

---

[17] At the hearing, Plaintiff did say that, on an average day, she basically watches TV. (AR 292). Plaintiff also said she picks up the house a little bit (*id*.) and participates in some meal preparation. (AR 294). This is largely consistent with the information provided in the Adult Function Report Plaintiff completed wherein she stated that her days are not productive. (AR 109).

of physical functions that are transferable to a work setting." *Fair*, 885 F.2d at p. 603 (emphasis omitted); see also *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (stating that adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace"). Here, there is neither evidence to support that Plaintiff's activities were "transferable" to a work setting nor proof that she spent a "substantial" part of her day engaged in transferable skills. *See Fair*, 885 F.2d at 603. The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Burch*, 400 F.3d at 681. The ALJ wrote that Plaintiff feeds and waters the dogs with her daughter's help; does simple meal preparation; dusts; does laundry with her daughter's help; walks; drives a car for short distances; rides in a car; and shops for groceries with her daughter's help. (AR 25). The ALJ concludes that these activities are consistent with the performance of at least light work on a maximum sustained basis.

The ALJ's description of these alleged transferable work skills is not entirely accurate. Plaintiff's testimony and other reports are quite consistent overall – she is in constant and substantial pain; she has difficulty waking in the morning; she goes outside twice each day, once to feed and water the family's dogs and that she has her daughter's help in preparing the dogs' food; she can walk for about one block before tiring and requiring rest; she can drive but only for very short distances; she cannot ride in a car for very long; she cannot lift or carry items of any significant weight (more than a few pounds); she cannot sit up for long periods of time and she requires frequent postural changes; writing and typing are painful and she cannot write for very long before needing to rest her hands; her handgrip is seriously impaired; she tires easily; she cannot raise her arms above her shoulders; the range of motion in her neck is restricted; she occasionally loses her balance; she drops things; her cooking consists of making sandwiches, using the microwave, and preparing simple meals a couple of times each week; she dusts some; she does laundry with assistance for a family of three; she grocery shops with her daughter's help about once per week for a family of three; she watches television about two hours each day and pursues no hobbies; and she describes her days as not productive.

37

Given the limited range of Plaintiff's transferable activities and/or the amount of time she is able to spend each day on activities that might be considered transferable to a workplace in light of her apparent strength and energy limitations, it is difficult to credit how such a physical regimen could fairly be considered consistent with the performance of at least light work on a maximum sustained basis. "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication [citations omitted]," *Fair*, 885 F.2d at p. 603.

The Commissioner contends that the ALJ properly rejected Plaintiff's subjective complaints for a variety of reasons the ALJ did not articulate in his decision, i.e., Plaintiff's pursuit of a conservative pain medication regimen and inconsistency between a failure to do much during the day and a lack of muscle atrophy.[18] Again, the Court cannot make findings for the ALJ. These factors were not evidence upon which the ALJ relied, according to his written decision. Again, it [would be] error for the district court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss." *Connett*, 340 F.3d at p. 874.

Based on the forgoing, the Court concludes that the ALJ did not set forth sufficient, adequate reasons for substantially discounting Plaintiff's subjective testimony. His failure to do so was legal error.

**D.** *Remand is Appropriate*

As *Benecke* advises,

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. [Citation omitted.] Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996); *Varney*, 859 F.2d 1396, 1399 (9th Cir. 1988). More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding

---

[18]   The Commissioner also argues that the ALJ further found that the activities to which Plaintiff referred in her function report were inconsistent with her subjective complaints of disabling pain, citing the Court to page 25 of the administrative record. We cannot locate such a statement on that page.

issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. [Citations omitted.] *Benecke*, 379 F.3d at p. 594.

Generally, when a court of appeals reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16, 154 L. Ed. 2d 272, 123 S. Ct. 353 (2002) (per curiam) (citation omitted); *see also Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir. 2004) (stating that remand is appropriate in most circumstances in cases involving disability benefits under the Social Security Act).

In this case, remand appears appropriate. Because the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony and Dr. Young's opinion, the evidence regarding Plaintiff's exertional and non-exertional functional limitations and restrictions should be credited as true. *Benecke*, 379 F.3d at p.94. The ALJ must decide whether Plaintiff can perform her past relevant work and, if not, whether she can perform other types of substantial gainful employment that exist in the national economy, in light of her residual functional capacity, including her exertional and non-exertional limitations.[19] The assistance of a vocational expert will undoubtedly be necessary here.

## CONCLUSION

For the reasons discussed above, this Court finds that the ALJ's decision is not supported by substantial evidence and is not free of legal error. Therefore, the Court orders that:

1. Plaintiff's social security complaint, Doc. 1, IS GRANTED;

///

---

[19] As noted in *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998), "In general, if a claimant suffers only from exertional limitations, ... the ALJ at step five may apply the Commissioner's Medical-Vocational Guidelines [the "grids"] to match the claimant with appropriate work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b). The grids are based on strength factors only. ... The ALJ may apply the grids in lieu of taking testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations. ... If the grids fail accurately to describe a claimant's limitations, the ALJ may not rely on the grids alone to show the availability of jobs for the claimant. ... See also *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986) (stating that application of the grids is inappropriate where a claimant's work capacity is significantly diminished beyond that caused by an exertional impairment). In these cases, the ALJ must also hear the testimony of a vocational expert [most internal citations omitted]."

1      2. This matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for

2  proceedings consistent with this opinion; and

3      3. The Clerk of the Court is DIRECTED to ENTER JUDGMENT for Plaintiff Jeanette Sue

4  Humecky and against Defendant Michael J. Astrue, Commissioner of Social Security, and to close

5  this file.

6

7  IT IS SO ORDERED.

8  Dated:   **March 24, 2009**                                    _____
                                                                                **/s/ Theresa A. Goldner**
9  _____                                                         UNITED STATES MAGISTRATE JUDGE